UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Mary Helfrich,                                    Case No.  3:12-cv-02223

        Plaintiff

  v.                                             MEMORANDUM OPINION
                                                  AND ORDER

Northwest Ohio Orthopedics
& Sports Medicine, Inc.,

        Defendant


     This matter is before me upon Defendant's motion for summary judgment, Plaintiff's opposition, Defendant's reply and Plaintiff's sur-reply.   Also before me is Plaintiff's request for oral argument.  This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331.  Having considered the arguments of the parties, I deny Plaintiff's request for oral argument and find the Defendant's motion to be well taken.

### BACKGROUND

     The parties do not dispute the following facts.  Northwest Ohio Orthopedics & Sports Medicine, Inc., ("NWO") is engaged in an orthopedics and sports medicine practice.  Among their services they offer orthopedic surgery, physical therapy, and occupational medicine.  NWO has three doctors, Drs. Brian Hecht, Bruce Heck, and Mike Tremains, who are also part owners of the entity.

In December 2007, Mary Helfrich began working at NWO through a temporary employment agency.   Along with other temporary employees, Helfrich converted medical charts from paper into electronic records.

In August 2008, NWO offered Helfrich full-time employment in the medical records department.  Helfrich was 58 years old at the time she began her employment at NWO.  Her position was that of Medical Records Technician.  Helfrich's duties included updating and filing documents for patient files for Drs. Hecht and Tremains.

Until August 2010, Helfrich's immediate supervisor was Shannon George.   Around that time, Shelly Neeley was promoted to supervisor of the Front Reception and Medical Records Department.  After that promotion, Neeley became Helfrich's immediate supervisor.  Neeley in turn, reported to Paula Miller, the head administrator.   At this point, the parties differ in their characterization of the events which ultimately culminated in Helfrich's termination in September 2011.

According to Helfrich, when Neeley became her supervisor, her performance reviews suffered and she was expected to complete assignments with fewer co-workers in the medical records department.  Neeley is twenty-three years younger than Helfrich and was hired approximately two years after Helfrich.  Helfrich also trained Neeley in medical records.  Within four months of her hiring, Neeley was promoted to supervisor of the Front Reception and Medical Records Department.

At or around the same time Neeley was hired, there were changes in the Medical Records Department regarding other employees.  According to Helfrich, her performance reviews under Shannon George had always been exemplary.  Once Neeley became her supervisor, the performance reviews were different, in part, because of a different evaluation form or matrix employed by NWO.

2

Because of this change in format, Helfrich was advised no one could exceed requirements as was possible in the previous format.

Additionally, there were only two employees dedicated to the Medical Records Department, those being Plaintiff and Neeley until mid-2011. Plaintiff was asked to train two persons who were new hires. One of these persons lasted approximately 30 days, the second person Helfrich helped train also needed additional assistance from Neeley.

At the same time, the business of NWO was increasing, according to both Miller and Neeley.

Helfrich was subject of a 30-day warning in April 2011. The warning cited her for substandard work quality and carelessness. She was given a 30-day window for improvement. The warning indicated that failure to improve would culminate in her dismissal. Helfrich, Miller, and Neeley met on April 29, 2011, regarding this warning. According to Helfrich, Neeley researched the charges and found them all to be negated, except for one situation. Helfrich also testified that the division of duties between her and Neeley, the only employees in Medical Records, was unclear:

> A: . . . To that point, to date we had not discussed the work distribution because prior to [Neeley's] employment I had been doing everything, so when she became my supervisor I wasn't sure what she was going to be specifically taking over to do herself. It was never set out who was going to do what.
>
> And now that I remember, I guess somebody had complained when [Neeley] was out of the office that whatever it was not being done, but at the time I didn't know if that was my responsibility and I was trying not to step on [Neeley's] toes, and [Neeley] emailed [Miller] and told her that was her responsibility because she had not discussed it with me, and subsequent to that we went through who was going to be doing what, what the distribution of duties was going to be.

(Helfrich Dep. at p. 61).

After this warning, she received supportive emails from Neeley and Miller regarding her efforts at keeping the workflow going during Neeley's short absence.  Helfrich also had emails from Neeley regarding tasks which were not completed.  On May 20, 2011, Neeley prepared a daily to-do list for Helfrich.  Miller also added items to this list.  (Miller Decl. at ¶ 5).

On September 6, 2011, Helfrich sent an email to Neeley and Miller expressing her frustration at futile training efforts and the general management of the department, aimed at Neeley:

> U were hired as an MR person—since pulled to do much else.  That's great for u-but leaves MR very short, Much of your time is being taken by interacting w/Sharon, Fortune, Megan, Tammy & whoever else decides to stop by-that's fine-do u realize how much time they use up?—leaving only one concrete person in MR & that is me.  I wish that I could do it all-  I truly do. . but . . when I started, MR was a full time 3 positions dept.  From where I am sitting, given what u r actually able to contribute-it has slipped to a one person slot.  Given your admin responsibilities—that is not going to work.
>
> There is more that I could say, having, probably said too much. I enjoy working there—I love u to pieces—even when u fire me for shooting off my mouth.  Your model is not working-u have to learn to admit when u r wrong, step back & re-group. . In our case it has to be now. . we need someone in there now.  Shelly-u have so many balls in the air.
>
> If I did not care about your success I would not say anything & just watch your ship sink—sooo—I'm sending this to Paula also.  U guys r mandated to find a solution and fast. . . I am truly sorry if I have offended anyone.  I am simply drawing on experience & hoping to head off the ire of our teams.  Spending time on training college kids who r only going to leave-in what should be a permanent position is utterly non-productive and a waste of my time.  It does not serve the practice well.
>
> Ok I'm stopping-I already have box to pack my stuff. . . one more thing-your 7am meeting r a real hardship on the moms-&me-is this frequency really necessary?  U spend a lot of time talking w/them--& w.everyone all of the time anyway. . . I don't mean to negate anyone but I have heard nothing in the 2 meetings previous that could not be presented otherwise quarterly comes to mind. . . just saying. . . mary

(*Id.* at Exh. 24).

Helfrich's employment was terminated on September 15, 2011. According to Helfrich, another younger employee, Claudia Azaroff allegedly replaced Plaintiff in the Medical Records Department. At her deposition, Helfrich's reasons for charging Defendant with age discrimination included other contemporaries being dismissed from employment, that she was the subject of ageist remarks by a co-worker, and the unfair treatment which resulted in her termination.

On August 30, 2012, Helfrich filed suit against NWO alleging age discrimination. On June 28, 2013, Defendant filed this motion for summary judgment arguing there is no genuine issue of material fact in dispute and it is entitled to judgment on the issue of wrongful termination on the basis of age discrimination.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (*quoting* FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v.*

5

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

## DISCUSSION

**A. Age Discrimination in Employment Act Standard**

The Age Discrimination in Employment Act ("ADEA") prohibits employers from

discriminating against employees on the basis of age. 29 U.S.C. § 623(a)(1)[1]. A claim of age discrimination can be established through direct or circumstantial evidence. *Lefevers v. GAF Fiberglass Corp.* 667 F.3d 721, 723 (6th Cir. 2012). "Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Systems, Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). In contrast, circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc).

Whereas here, the plaintiff presents allegations based upon circumstantial or indirect evidence, the claim is analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). At all times, the burden of persuasion is upon the plaintiff to demonstrate " 'age was the "but-for" cause of their employer's adverse action.' " *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010) *citing Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009).

In establishing a prima facie case of age discrimination, evidence must be proffered on the following factors: "(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination." *Blizzard v. Marion Technical College*, 698 F.3d 275, 283 (6th Cir. 2012), *citing Swierkieewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). When a prima facie case is established, the burden of production then "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. Once the employer has met its burden, the burden shifts back to the plaintiff to show, by a preponderance of the evidence, that the employer's stated reason for the adverse action is pretextual. *Texas Dept. of Community Affairs*, 450 U.S. 248, 253 (1981) citing *McDonnell* at 804.

---

[1] "(a) Employer practices
　　It shall be unlawful for an employer—
　　　　**(1)** to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms conditions, or privileges of employment, because of such individual's age;"

7

B.  **Prima Facie Case**

Neither side disputes Helfrich meets the first three prongs of the prima facie case.  She is within the protected group as she is over forty years of age.  There is no dispute she was qualified for her position and she suffered an adverse employment action insofar as she was terminated from her job.

This leaves the fourth factor, i.e., that the claimant was replaced by someone outside the protected class.  *Carter v. Toyota Tsusho America, Inc.,* __Fed. Appx.__, 2013 WL 3306336 *6 (6th Cir. 2013).  The Sixth Circuit has explained what is necessary to establish this fourth factor as follows:

> A "person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.  A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties."

*Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) (citations omitted).

Here, the parties disagree on whether NWO employee, Claudia Azaroff, replaced Helfrich after her termination.  Azaroff was in her late twenties in the fall of 2011 and outside of the protected class.  Azaroff testified that she was given the option to stay at the front check-out, where she had been, or move to Medical Records.  (Azaroff Dep. at p. 49).  At the time she was offered the new position, she was not told she would be replacing anyone and the Medical Records team consisted of Neeley, Helfrich, and Andrew Thompson.  (*Id.* at p. 48).  When Azaroff made the decision to be transferred to Medical Records and moved to that department, Helfrich had already been terminated.  (*Id.* at 49).  Miller contended that following Helfrich's termination, her duties were divided amongst Neeley, Azaroff, and Thompson.  (Miller Decl. at ¶ 9).

Helfrich also contends that other NWO contemporaries over the age of forty were also terminated thereby establishing a practice of terminating older employees and replacing them with

8

younger persons. (Helfrich Dep. at pp. 7-18). At her deposition, Helfrich named five former NWO employees who fell into this category. (*Id.* at p. 7-8). When asked about specifics she noted that two left by mutual agreement and was unsure why the other three were no longer there. (*Id.* at p. 9-17).

It is unclear whether Azaroff actually replaced Helfrich. Azaroff's transfer to the Medical Records Department, however, occurred in temporal proximity to Helfrich's termination. When coupled with the age differential of more than ten years, it is sufficient to raise an inference to meet the fourth factor. *See Grosjean*, 349 F.3d at 336 (age difference of more than ten years is significant in establishing the fourth factor in a prima facie case). Azaroff had also just come through her ninety-day probationary period and her supervisor prior to her transfer to Medical Records was also Neeley. As I am required to draw all reasonable inferences in Plaintiff's favor, while a close call, I find she has presented circumstantial evidence sufficient to meet the final factor in establishing a prima facie case.

## C. Pretext

Defendant relies upon Paula Miller's testimony as supporting the reasons for terminating Helfrich. Among others, those reasons included periodic counseling on performance issues, a written warning in April 2011, continued problems with performance, and the September 6, 2011 email sent to Neeley and Miller. (Miller Dep. at pp. 125-128). This is sufficient to meet NWO's burden as "[p]oor performance is a legitimate, nondiscriminatory reason for terminating an employee." *Stockman v. Oakcrest Dental P.C.,* 480 F.3d 791, 802 (6th Cir. 2007). The burden shifts back to Plaintiff to show the reason was pretextual.

Pretext is established when a plaintiff demonstrates, by a preponderance of the evidence, one or more of the following:

> (1) That the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the

9

> adverse employment action], or (3) that they were
> insufficient to motivate [the adverse employment action].
> *Id.* (quoting *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444,
> 460 (6th Cir. 2004)). The plaintiff may also demonstrate
> pretext, however, by offering evidence that challenges the
> reasonableness of the employer's decision, to the extent
> that such an inquiry sheds light on whether the
> employer's proferred reason for the employment action
> was its actual motivation.

*Rachells v. Cingular Wireless Employee Services, LLC*, __F.3d__, 2013 WL 5645239 *13 (6th Cir. Oct. 17, 2013). Stated differently, " '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" *Blizzard*, 698 F.3d at 285 *quoting Chen*, 580 F.3d at 400 n.4.

1. No Basis In Fact

Helfrich challenges the history of performance issues alleged by NWO. The emails relied upon by the Defendant, she argues, merely reflect normal coaching and supervisor direction. The issues raised in the April 2011 written warning were all negated by Neeley, and Helfrich met her thirty-day improvement goal. She also contends that another similarly situated employee, Azaroff, was also counseled regarding her performance problems but ultimately transferred to another department as opposed to being terminated.

Neeley testified she complained to Miller regarding Helfrich's job performance before and after she became a supervisor. The Defendant does not dispute that after the April 2011 written warning, Helfrich met her thirty-day improvement period. At her deposition, Neeley stated that most of the items contained in the warning were negated and that she communicated this information to Miller. The warning remained, however, because according to Neeley, "there were so many things that were already justifying this action prior to when this [warning] took place." (Neeley Dep. at p. 155-56). After this warning, emails continued to be generated to or about Plaintiff regarding Helfrich's work habits or tasks:

- 5/12/11 regarding sorting faxes, hospital mail, and scanning;

10

- 5/18/11 regarding an uncompleted Bureau of Workers Compensation item;
- 7/11/11 after Neeley met with Helfrich, she emailed Miller regarding unapproved shortened lunches and unauthorized overtime;
- 9/8/11 failure of Helfrich to follow-through with patient records request.

The situation regarding Azaroff is somewhat different. Azaroff was a new and probationary employee who was adjusting to her placement. According to Miller, if a probationary employee had problems adjusting to the position, they would be given an option to transfer to another department. (Miller Dep. at p. 81). Miller testified Azaroff was placed in the Medical Records Department on a part-time basis and sometime in September or October 2011, she was a full-time employee in that department. Miller explained the philosophy regarding new employees, "if someone is in their 90 day review and are not understanding their position and has also made a request then we take that into consideration to move someone to another department that may be a better fit for their needs as well as our needs." (*Id.*) Unlike Helfrich, Azaroff did not receive multiple emails alerting her to deficiencies because as a probationary employee she was given regular guidance by her supervisors during the probationary period. As Miller noted, a long-time employee should not have been having the types of problems exhibited by Helfrich. (*Id.* at p.217).

  2. Stated Reason For Termination Was Not The Actual Reason For Termination

Under this factor, Helfrich contends the Defendant's failure to properly staff its facility or department was the real reason for the termination. Helfrich was unable to keep up with an increasing workload with Neeley as the only other employee to assist her in the Medical Records Department. Helfrich states she witnessed her older co-workers being terminated or "forced out of their employment" during NWO's restructuring of their intake, medical records, and front reception departments so there were no employees over the age of forty in those units.

11

Regarding other co-workers over the age of forty who were forced out or terminated, Helfrich testified as follows:

- Carol Prosser-who worked at the front reception-was involuntarily terminated.  Helfrich was unable to give any specifics, just that it was her "understanding" of the situation and that was the word which "was going around."  (Helfrich Dep. at pp. 8-10).

- Kay Barth—Helfrich was told by Miller that Barth was terminated for "not fulfilling her responsibilities."  Helfrich did not talk to anyone else at NWO about Barth's departure.  (*Id.* at pp. 11-12).

- Faith Garver—Helfrich understood Garver was terminated for a dispute over her time sheet. Garver told her it was an accident and Helfrich did not speak with anyone else about the particulars of the incident.  (*Id.* at pp. 12-14).

- Jo Wilson—Helfrich understood Wilson's departure to be a mutual decision. At the time Wilson was hired, all employees were being cross-trained and the process was overwhelming to Wilson.  Helfrich was unable to state with certainty that Wilson's departure was a termination or resignation.  (*Id.* at pp. 14-16).

- Laura Greer—Helfrich understood that Greer resigned her position as the front reception supervisor.  Helfrich understood Greer felt she was being "scrutinized closely" and that Greer was employed elsewhere now.  (*Id.* at pp. 16-17).

Helfrich also testified she was training younger new employees.  (*Id.* at p. 18).

12

NWO contends that since the beginning of 2011, it has hired more than twenty-five new employees who are in the protected class. (Miller Decl. at ¶ 10). Of the nine voluntary terminations since that same time period, the majority of employees terminated were under the age of forty. (*Id.*)

Regarding Helfrich's workload, Neeley testified the Plaintiff was responsible for the dictation of two doctors. While Neeley was only responsible for one, she noted the one doctor produced an equal amount of work as the two Helfrich covered. (Neeley Dep. at p. 89). Neeley characterized Helfrich's performance as occurring in "spurts" and would improve after a conversation with her on her lagging performance. (*Id.* at 130-31).

Helfrich's assertion as to older employees being "forced out," when considered in conjunction with her deposition testimony, does nothing to support her claim of bias on the basis of age. Similarly, her contention as to the understaffing of her department, without more, is not evidence of age discrimination. *See Stockman*, 480 F.3d at 803 (plaintiff had little evidence to support his claim of patient manipulations related to understaffing); *Ruff v. Target Stores, Inc.,* 266 Fed. Appx. 294, 301 (4th Cir. 2007) (employee claiming understaffing accounted for her sub-par performance was unable to discount instances of ineffectiveness confirming employer's perception of job expectations); *Nichols v. Drexel Chemical Co.*, 2013 WL 228915 (W.D. Tenn. 2013) (trial court found arguments of understaffing immaterial to the legal issues presented); *Meyers v. Wood*, 2013 WL 4823171 (D.S.C. 2013) (in race discrimination claim, the plaintiff's opinion that disciplinary measures were attributable to understaffing did not undermine the employer's expectations of plaintiff's performance).

3. Stated Reasons Were Insufficient to Motivate the Discharge

As for this factor, Helfrich points to the performance deficiencies exhibited by Azaroff and Defendant's treatment of her as contrasted with the Plaintiff. As noted above, Azaroff was a probationary employee while Helfrich had been with NWO for three years. Azaroff was at the

13

reception desk while Helfrich was in the Medical Records Department.  Azaroff simply cannot be compared to Helfrich for purposes of this analysis.

    4.   Honest Belief Rule

NWO also contends the evidence proffered by Helfrich is not sufficient to overcome the "modified honest belief" rule, which has been explained by the Sixth Circuit as follows:

> '[T]o avoid a finding that its claimed nondiscriminatory reason was pretexual, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.' *Escher v. BWXT Y-12, LLC* , 627 F.3d 1020, 1030 (6th Cir. 2010) (quoting *Wright v. Murray Guard, Inc.* , 455 F.3d 702, 708 (6th Cir. 2006)).  The employee, in turn, "must be afforded the opportunity to produce evidence to the contrary, such an error on the part of the employer is 'too obvious to be unintentional.'" *Seeger v. Cincinnati Bell Tel. Co.,* 681 F.3d 274, 286 (6th Cir. 2012) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998).  To overcome the employer's invocation of the honest belief rule, the employee "must allege more than a dispute over the facts upon which [the] discharge was based.  He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001).

*Blizzard*, 698 F.3d at 286.

Here, Helfrich's evidence of pretext is based on her opinion and perception of how Defendant's operation was being staffed or understaffed.  Assuming *arguendo* Defendant was understaffed in Helfrich's department, there is still no evidence to support Plaintiff's termination was based upon her age.  Helfrich was troubled by references to her as "Mom" by a co-worker named Chris and she reported these to Neeley.  (Helfrich Dep. at p. 18).  Helfrich also told Chris, "I am not your mother."  (*Id.* at p. 19).  Neeley testified that Helfrich did report these incidents and that Chris called everyone "Mom."  (Neeley Dep. at pp. 170-73).   Moreover, Chris was not

14

Helfrich's supervisor nor did she have any rule in the decision making process in terminating Plaintiff's employment.

Helfrich has not presented evidence to establish that her termination was pretext for age discrimination.  Helfrich was hired by NWO at age fifty-eight.  She was offered the full-time employment by Miller.  She was asked to train new employees because of her experience.  She does not dispute she was the subject of emails regarding her performance and daily tasks.  Finally, Helfrich's September 6, 2011 email to Neeley and Miller expressed her views on management, in which she acknowledged the possibility of her own termination.  At her deposition, Miller stated that this email confirmed the decision to terminate Helfrich because she was not a good "fit" for the company as evidenced by her performance issues .  (Miller Dep. at pp. 203, 207).  Finally, it was Miller who ultimately decided to terminate Helfrich's employment.   As a plaintiff always bears the burden of establishing age bias was a proximate cause of the termination, the evidence in this case fails to show that age was the reason for Helfrich's dismissal.

As Helfrich has failed to establish pretext and cannot overcome the employer's honest belief, I cannot find she has created a genuine issue of material fact on her claim of age discrimination.  Accordingly, NWO is entitled to summary judgment.

## Conclusion

For the reasons stated above, Defendant NWO's motion for summary judgment (Doc. No. 16) is granted.  Plaintiff's request for oral argument is denied as moot.

So Ordered.

s/ Jeffrey J. Helmick  
United States District Judge

15